```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/19/15
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

MELODRAMA PUBLISHING, LLC,                :

                      Plaintiff,             :

     - against -                                         :

DANIELLE SANTIAGO,                                 :

                      Defendant.           :

------------------------------------------------------------x

**REPORT AND RECOMMENDATION TO THE HONORABLE JED S. RAKOFF***

12cv7830-JSR-FM

**FRANK MAAS**, United States Magistrate Judge.

I.    Background

       This is one of two lawsuits filed in this District regarding intellectual property rights falsely claimed by Danielle Santiago ("Santiago"). In the first action, Santiago v. Melodrama Publishing, LLC, 11 Civ. 3180 (JSR) ("Copyright Action" or "CA"), Santiago asserted copyright and related claims against Melodrama Publishing, LLC ("Melodrama"), and its principal, Crystal L. Winslow ("Winslow"), arising out of their publication of two books – "Cartier Cartel" and "Return of the Cartier Cartel" – that were distributed under the pseudonym "Nisa Santiago." Santiago claimed that Melodrama had violated her rights by using without her permission text and cover art that she had played a role in creating. (CA, ECF No. 1). On July 7, 2011, Your Honor dismissed the Copyright Action with prejudice. (Id., ECF No. 11). Although there does

---

    *    This Report and Recommendation was prepared with the assistance of Toby Howard, then a student at the Berkeley School of Law.

not appear to be any transcript of Your Honor's oral ruling, Santiago apparently did not oppose the motion, thereby conceding that she had no valid copyright in the works.

Santiago's counsel in the Copyright Action was Jeffrey Wooten, Esq. By coincidence, on the same day that Melodrama moved to dismiss the Copyright Action, Mr. Wooten filed a trademark application on behalf of Santiago, claiming rights to a "series of books and written articles in the field of fiction" using the Nisa Santiago "word mark." (See U.S. Trademark Application Serial No. 85340152 (filed June 7, 2011)). In support of that application, Mr. Wooten sent the Patent and Trademark Office images of the cover art for the Cartier Cartel book, and further represented that Santiago first had used the word mark in commerce as early as April 28, 2009. (See id.; Tr. 14).[1] Mr. Wooten made these representations based, in part, on his telephone conversations with Santiago, whom he never met in person. (Tr. 5, 7-8). At the time, Mr. Wooten did not notice that the JPEG images of the cover art prominently displayed the words "Melodrama Publishing."[2] (Id. at 12).

After the Nisa Santiago trademark issued, Mr. Wooten sent cease and desist letters to Melodrama and several distributors of the Nisa Santiago books, including

---

[1] "Tr." refers to the transcript of the evidentiary hearing in this action held on December 18, 2013. (ECF No. 38).

[2] A few months later, Mr. Wooten filed a trademark application on behalf of Santiago claiming rights for the "Cartier Cartel Chronicles" word mark. According to the Trademark Electronic Search System of the United States Patent and Trademark Office, that application was abandoned on March 29, 2012. (See U.S. Trademark Application Serial No. 85397207 (filed August 12, 2011)).

Amazon.  (Id. at 24).  Only Amazon agreed not to distribute further copies of the books. (Id. at 28; ECF No. 32 (Winslow Aff., sworn to on May 30, 2013 ("Winslow Aff.") ¶ 2)).  As a consequence, Melodrama was unable to make sales of its Nisa Santiago books from late October 2012 through late May 2013.  (Winslow Aff. ¶ 4).

On October 19, 2012, Melodrama commenced the present action ("Trademark Action"), seeking cancellation of the Nisa Santiago trademark as well as damages.  (ECF No. 1 ("Complaint")).  That, in turn, caused Mr. Wooten to engage in a more searching inquiry and ultimately to admit in Santiago's answer to the Complaint that Santiago in fact never had used the Nisa Santiago mark in commerce in connection with the publication of books.  (Tr. 8; Complaint ¶ 61; ECF No. 4 (Answer) ¶ 61).  Citing health reasons, Mr. Wooten then withdrew from this action on January 4, 2013.  (See ECF No. 18).  Successor counsel appeared on March 1, 2013, but since has moved to withdraw from any further representation of Santiago based on Santiago's nonpayment of fees.  (ECF Nos. 22, 40-42).[3]

On April 10, 2013, Your Honor granted Melodrama's motion pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings.  (ECF No. 26 ("Trademark Decision" or "Trademark Dec.")).  Insofar as relevant, Your Honor found that Santiago had never used the Nisa Santiago mark in commerce, and that Melodrama had been using it in commerce since 2007.  (Id. at 5).  Accordingly, Your Honor canceled Santiago's Nisa Santiago trademark registration on several grounds,

---

[3] In a separate order bearing today's date, I have granted that application.

including fraud. (Id. at 8-14). The matter further was referred to me to conduct an inquest. (Id. at 15). Because Mr. Wooten had filed both the Copyright Action and the Nisa Santiago trademark application, Your Honor suggested that one issue I might wish to consider with respect to damages was whether Santiago or Mr. Wooten was the principal malefactor. (See id.). As a consequence, I subsequently held an evidentiary hearing. Mr. Wooten was the sole hearing witness.

Mr. Wooten testified that he never had met Santiago, who painted herself as a victim of sharp practice on the part of Winslow, who allegedly had reneged on two written agreements concerning the authorship of the Nisa Santiago books. (Tr. 5, 12-14). Mr. Wooten further testified that he had not read the portion of the contracts between Santiago and Melodrama that stated that Melodrama retained "any and all rights" and that Santiago had "zero rights" in the event that their business relationship came to an end.[4] (Id. at 13). Mr. Wooten also forthrightly conceded that he had not noticed that the JPEGs of the book covers that he proffered to the Patent and Trademark Office as proof of Santiago's use of the Nisa Santiago mark "in commerce" contained Melodrama's name. As he explained:

> Her story to me was so sympathetic that I really didn't do the
> due diligence that I should have done. However, . . . once the
> [Trademark Action] complaint was filed, I felt . . . I really

---

[4] Paragraph 31 of each of the contracts states that Santiago has no right "in or to any trademark trade name, logo, imprint or other identification now or hereafter used by [Melodrama], nor shall [Santiago] use any such identification during the term of th[e] agreement or thereafter." (Trademark Dec. at 3).

4

> . . . needed to take a look and go back and not just take what she said at face value.

(Id. at 10).

In short, while Mr. Wooten may not initially have done as much factual research as he should have, he was hoodwinked by Santiago, who claimed rights that she did not have based on allegations that were untrue. I further am convinced that Mr. Wooten's health problems did not affect his judgment with respect to the Copyright Action. For these reasons, to the extent that Melodrama is awarded damages, the judgment should be entered only against Santiago.

## II. Damages

Turning to the question of damages, despite having been afforded notice and an opportunity to participate in the inquest, Santiago has failed to respond or request a hearing. As a consequence, because Melodrama's written submissions provide a basis for the Court to determine the amount that Santiago owes to Melodrama, there is no need to hold a further hearing with respect to this issue. See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997).

### A. Trademark Damages

To calculate its lost net profits, Melodrama has employed a relatively simple formula. As Winslow explains, Melodrama determined its average monthly royalties from Amazon's sales of each of its Nisa Santiago e-books in the United States and the United Kingdom for the twenty-five month period from October 2010 (when such

5

sales began) through October 27, 2012 (when Amazon stopped further sales). (Winslow Aff. ¶ 10). Melodrama then multiplied that average monthly loss by the number of months that it was unable to sell its Nisa Santiago books through Amazon. (Id.).[5]

       Two brief observations concerning Melodrama's lost profits calculation are in order. First, the twenty-five month average that Melodrama has used to calculate its monthly damages could serve to inflate its recovery if sales of particular Nisa Santiago titles declined over time. My review of the Amazon sales charts confirms, however, that the sales of the Nisa Santiago books did not consistently decline in a linear pattern as time passed. Accordingly, any formula used to calculate Melodrama's lost sales is at best an estimate. Nevertheless, by failing to participate in any phase of this litigation – including this inquest – Santiago has waived the right to second-guess Melodrama's calculations, so long as Melodrama's approximation of its damages is supported by "just and reasonable inference." See Sturdy Logic, LLC v. Clear Net Plus, Inc., No. 11 Civ. 4343 (CLP), 2012 WL 4329349, at *14 (E.D.N.Y. Sept. 21, 2012) (quoting Taylor Made Golf Co. v. Carsten Sports Ltd., 175 F.R.D. 658, 663 (S.D. Cal. 1997)). Here, although Melodrama's formula for calculating damages may not be perfect, it certainly more than meets this forgiving standard.

---

[5] Since e-books are digital downloads, the publishing costs, if any, are negligible. (Winslow Aff. ¶ 6).

Second, the Amazon sales reports set forth the royalties for the sales of Nisa Santiago titles in the United Kingdom in British Pounds, not United States Dollars. Melodrama's calculations of lost United Kingdom sales consequently are accurate only to the extent that Melodrama used an appropriate currency conversion rate for each month of sales. Having spot-checked Melodrama's calculations against publicly-available currency conversion tables for the periods in question, it appears that Melodrama has, if anything, underestimated the dollar value of its lost United Kingdom royalties.

For these reasons, I recommend that, as has been requested, Melodrama be awarded damages for lost sales in the amount of $64,365. (See Winslow Aff. Exs. A, B).

B.  Attorneys' Fees

Your Honor previously determined that this Trademark Action is an "exceptional case" under 15 U.S.C. § 1117(a), in which Santiago's fraudulent conduct justifies an award of the attorneys' fees that Melodrama incurred. (Trademark Dec. at 15-16). Accordingly, in its inquest papers, Melodrama seeks to recover $65,854.12 for the fees that it incurred in connection with this matter for the period from October 2, 2012, through March 31, 2013, and an additional $30,150 for the additional fees incurred from April 11 through May 31, 2013, in connection with the inquest. (See ECF No. 31 (Affirm. of Robert J. Shapiro, dated May 31, 2013 ("Shapiro Aff.") ¶ 22 & Exs. C-F)). The first amount for which payment is sought has been paid by Melodrama. (Id. ¶ 25). The second amount was billed the same day as Melodrama filed its fee application and, therefore, has not been shown to have been paid. Winslow has averred, however, that

Melodrama intended to "timely pay the same." (Winslow Aff. ¶ 15). Melodrama also clearly incurred further fees in connection with its counsel's preparation for, and participation in, the December 2013 hearing at which Mr. Wooten testified, as to which Melodrama has made no further fee application.

To determine the amount of attorneys' fees to which a party is entitled, a court must calculate the "presumptively reasonable fee," often referred to as the "lodestar." Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany, 522 F.3d 182, 183, 189-90 (2d Cir. 2008). That amount is "the rate a paying client would be willing to pay . . . bear[ing] in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." Id. at 190; see also Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 552 (2010) (noting that the lodestar method is "objective, . . . cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predicable results") (internal quotation marks omitted). Courts calculate the presumptively reasonable fee by multiplying the reasonable number of hours that the case requires by the reasonable hourly rates. Millea v. Metro-N. R.R. Co., 658 F.3d 154, 166 (2d Cir. 2011).

1. Reasonable Hourly Rate

In assessing the reasonableness of an attorney's hourly rate, the Court must consider whether "the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, expertise and reputation." I.B. v. N.Y.C. Dep't of Educ., 336 F.3d 79, 80 (2d Cir. 2003) (quoting Blum v. Stenson,

465 U.S. 886, 895 n.11 (1984)).  In doing so, the Court may rely on its own knowledge of private firm hourly rates.  Miele v. N.Y. State Teamsters Conference Pension & Ret. Fund, 831 F.2d 407, 409 (2d Cir. 1987).  The "relevant community" is "normally the forum district."  Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany, 369 F.3d 91, 96 (2d Cir. 2004).

Three lawyers and one paralegal at the Shapiro Firm LLP ("Firm") worked on this matter.  The three lawyers' customary time charges were discounted by fifteen percent – subject to a somewhat unusual billing proviso which stated that if there was a fee recovery, "the discount would be recouped."  (Shapiro Affirm. ¶ 22).  Thus, either Melodrama or its counsel would recover more than the actual attorney's fees paid if this proviso were given force.  There is no need to discuss this possibility since Melodrama has in fact sought to recover only the discounted amounts it has paid or will pay.

Partners Robert J. Shapiro and Jonathan Shapiro billed Melodrama at their discounted rate of $425 per hour.  (Id. ¶ 19).  Robert Shapiro is a 1994 graduate of Michigan State University School of Law and has been a Firm partner since 1998.  (Id. ¶ 11).  Jonathan Shapiro is a 1994 graduate of Fordham Law School, who clerked for a district judge in the District of New Jersey, before spending seven years as an associate at a large New York City firm.  (Id. ¶ 12).  He joined the Firm as a partner in 2002.  (Id.). Both partners' areas of specialization include counseling and litigating with respect to intellectual property and unfair competition matters.  (Id. ¶¶ 11, 12).

Kerry Foley, counsel to the Firm, is a Harvard Law School graduate who has been practicing since 1996. (Id. ¶ 13). Before joining the Firm in 2006, Ms. Foley was an associate in both the litigation and trade regulation departments of a large New York firm. (Id.). Melodrama seeks to recover fees for her work at the rate of $375 per hour. (Id. ¶ 20).

Finally, Johanna Martinez, a paralegal, has been with the Firm since 2008. Ms. Martinez spent only 3.8 hours on this case, for which Melodrama seeks to recover fees at her customary billing rate of $175 per hour. (Id. ¶¶ 14, 20, 23).

The fact that Melodrama paid the Firm these rates for legal services strongly suggests that they are fair and reasonable. See Diplomatic Man, Inc. v. Nike, Inc., No. 08 Civ. 139 (GEL), 2009 WL 935674, at *5 (S.D.N.Y. Apr. 7, 2009) (Lynch, D.J.) (quoting Arbor Hill, 522 F.3d at 190 ("[T]he reasonableness of an hourly fee may be determined exclusively by 'the rate a paying client would be willing to pay.'")). Moreover, the rates charged by each of the Firm's attorneys are consistent with the rates charged by other practitioners with comparable backgrounds for similar work. See, e.g., Teen Model v. Blood is the New Black, 11 Civ. 5766 (GBD) (DF), 2012 WL 5838185, at *4 (S.D.N.Y. Oct. 26, 2012) (approving rate of $450 per hour for name attorney at small firm in intellectual property matter); Pegoraro v. Marrero, 10 Civ. 51 (AJN) (KNF), 2013 WL 55829, at *1, *3 (S.D.N.Y. Jan. 4, 2013) (approving $395 hourly rate for litigator at small firm who graduated from law school in 1999). On the other hand, the work of the Firm's paralegal is described in the inquest papers as "assistance in the physical assembly

and reproduction of motion papers and mailing and service of same." (Shapiro Affirm. ¶ 14). For this reason, and in light of the small size of the Firm, the requested rate seems high. See Guallpa v. N.Y. Pro Signs, Inc., 11 Civ. 3133 (LGS) (FM), 2014 WL 2200393, at *10 (S.D.N.Y. Apr. 27, 2014) (recent decision awarding much larger firm $125 per hour for paralegals). I therefore conclude that the hourly rate for the Firm's paralegal should be reduced to $100 per hour. Given the relatively few hours she worked on this case, this results in only a modest downward adjustment.

### 2. Hours Reasonably Expended

To enable a court to determine the reasonableness of the hours expended, a party seeking an award of attorneys' fees must submit contemporaneous time records indicating the number of hours expended and the nature of the work done. See Lewis v. Coughlin, 801 F.2d 570, 577 (2d Cir. 1986); N.Y. State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983); Puglisi v. Underhill Park Taxpayer Ass'n, 964 F. Supp. 811, 817 (S.D.N.Y. 1997).

Perhaps reflecting its small size, the Firm's timesheets reflecting the time spent and work undertaken by the two partners are handwritten, and have been summarized, together with Ms. Foley's typewritten timesheet entries, in invoices containing a single run-on sentence describing the professional services rendered during the billing period. (Shapiro Affirm. Exs. C-E). Although a billing methodology of this sort certainly is no longer commonplace, there is no reason to doubt the accuracy of the entries or that the timekeepers made them contemporaneously.

Turning to the timekeepers' work activities, there is no reason to second guess the approximately 177.5 hours of attorney time that the Firm billed in the period before Your Honor issued the Trademark Decision.  Thereafter, however, the Firm spent nearly 75 hours preparing its inquest papers.  Moreover, sixty percent of that time was billed by the two partners assigned to the case.  While that strikes me as excessive, it also is true that Melodrama has not submitted a further application to recover the additional fees that it unquestionably has incurred in connection with the evidentiary hearing held in December 2013.  Balancing these factors against one another, I conclude that the time charges for April and May 2013, totaling $30,150, should nevertheless be reduced by twenty-five percent.  See In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 226, 237 (2d Cir. 1987) (quoting Carey, 711 F.2d at 1146) (A "district court has the authority to make across-the-board percentage cuts in hours 'as a practical means of trimming fat from a fee application.'"); Heng Chan v. Sung Yue Tung Corp., No. 03 Civ. 6048 (GEL), 2007 WL 1373118, at *5 (S.D.N.Y. May 8, 2007) (same); see also Fox v. Vice, 131 S. Ct. 2205, 2216 (2011) (in evaluating fee applications, district courts "need not, and indeed should not, become green-eyeshade accountants").

After making the necessary adjustments, I conclude that Melodrama should recover attorneys' fees as follows:

| PERIOD | REQUESTED AMOUNT | ADJUSTED AMOUNT |
|---|---|---|
| 10/3/2012 - 03/31/2013 | $65,854.12 | $65,569.12 |
| 04/1/2013 - 12/18/2013 | 30,150.00 | 22,612.50 |
| | **TOTAL** | **$88,181.62** |

C. <u>Disbursements</u>

Melodrama further seeks to recover $597.04 in disbursements reflected in the bills it has paid and an additional $50 in disbursements reflected in the bill it has undertaken to pay, <u>i.e.</u>, a total of $647.04. (Shapiro Affirm. ¶¶ 26, 29).

In cases involving attorney fee-shifting, the sums that the prevailing party may recover are not limited merely to taxable costs. Rather, the court may award "[r]easonable and indentifiable out-of-pocket disbursements ordinarily charged to clients." <u>Lyons P'ship, L.P. v. D&L Amusement & Entm't, Inc.</u>, 702 F. Supp. 2d 104, 122 (E.D.N.Y. 2010) (citing <u>LeBlanc-Sternberg v. Fletcher</u>, 143 F.3d 748, 763 (2d Cir. 1998)).

In addition to the $350 fee to file this action, Melodrama seeks to recover the costs associated with process service, court transcripts, and courier services. Each of these charges is among the types of disbursements that law firms typically charge their clients and therefore is recoverable. Melodrama therefore should be awarded disbursements in the amount of $647.04. (<u>See</u> Shapiro Affirm. ¶ 22 & Ex. G).

13

D.   Prejudgment Interest

Melodrama also seeks to recover prejudgment interest on its lost profits at the nine percent rate applicable to contract actions in the New York courts. "Although [15 U.S.C. §] 1117(a) does not provide for prejudgment interest, such an award is within the discretion of the trial court and is normally reserved for 'exceptional' cases." Merck Eprova AG v. Gnosis S.p.A., 760 F.3d 247, 264 (2d Cir. 2014) (quoting Am. Honda Motor Co. v. Two Wheel Corp., 918 F.2d 1060, 1064 (2d Cir. 1990)). Here, as noted above, Your Honor has determined that this case is "exceptional." (Trademark Dec. at 15-16). An award of prejudgment interest therefore is warranted.

In GTFM, Inc. v. Solid Clothing, Inc., No. 01 Civ. 2629 (DLC), 2002 WL 31886349, at *4 (S.D.N.Y. Dec. 26, 2002), Judge Cote awarded interest in an exceptional case at the nine percent rate requested here, but did not explain why she chose that rate. In other cases, courts have applied the significantly lower statutory rate set forth in Section 1117(b), which is applicable to lawsuits involving the intentional use of a counterfeit trademark. See, e.g., Merck Eprova AG v. Gnosis S.p.A., 901 F. Supp. 2d 436, 461 (S.D.N.Y. 2012). The two subsections differ in that Section 1117(b) provides for treble damages, while Section 1117(a) cautions that any excess sums awarded should "constitute compensation" and not be a "penalty." See Leviton Mfg. Co. v. Fastmac Performance Upgrades, Inc., No. 13-CV-01629 (LGS) (SN), 2014 WL 2653116, at *6 (S.D.N.Y. Feb. 28, 2014). In light of this admonition, and recognizing that this is an era of low interest rates, Melodrama's prejudgment interest should be capped at the rate set

forth in Section 1117(b).  That section incorporates by reference the rate established under 26 U.S.C. § 6621(a), which is "the sum of – (A) the Federal short-term rate . . . [for the first month in each calendar quarter], plus (B) [three] percentage points."  26 U.S.C. § 6621(a) (2).

Melodrama's lost sales, of course, increased with each passing month.  In that circumstance, it is appropriate to award Melodrama prejudgment interest on its total lost profits from February 15, 2013 (the approximate midpoint of the period that Amazon refused to sell Melodrama's Nisa Santiago e-books), through the date judgment is entered.  See, e.g., Manzo v. Sovereign Motor Cars, Ltd., No. 08-CV-1229 (JG) (SMG), 2010 WL 1930237, at *12 n.21 (E.D.N.Y. May 11, 2010) ("Utilizing the midpoint date is a practical method of accounting for the fact that [the plaintiff's] damages accrued over a period of time . . . ."); see also Angamarca v. Pita Grill 7 Inc., No. 11 Civ. 7777 (JGK) (JLC), 2012 WL 3578781, at *9 (S.D.N.Y. Aug. 2, 2012) (Under New York law, "[s]imple pre-judgment interest is calculated from a singular, midpoint date.").

III.   Conclusion

For the foregoing reasons, Melodrama should be awarded damages for lost profits in the amount of  $64,365, attorneys' fees in the amount of $88,181.62, disbursements in the amount of  $647.04, and prejudgment interest on the sum of $64,365 from February 15, 2013, through the date judgment is entered, at the rate set forth in 26 U.S.C. § 6621(a) (2).

IV.	Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Jed S. Rakoff, and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Rakoff. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

Dated:	New York, New York
	May 19, 2015

_____
FRANK MAAS
United States Magistrate Judge

Copies to All Counsel via ECF